In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 15-3277

HERNEL SILAIS,

*Petitioner*,

*v.*

JEFFERSON B. SESSIONS III,
Attorney General of the United States,

*Respondent*.

---

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A200-567-560

---

ARGUED APRIL 11, 2017 — DECIDED APRIL 28, 2017

---

Before WOOD, *Chief Judge*, and FLAUM and EASTERBROOK, *Circuit Judges*.

FLAUM, *Circuit Judge*. Hernel Silais, a Haitian citizen and opposition political party member, petitioned the United States for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The Immigration Judge, and later the Board of Immigration Appeals (collectively, the "Agency"), denied his petition. We do the same.

## I. Background

On February 5, 2011, Silais arrived in the United States without an immigrant visa or other valid entry document. The Department of Homeland Security ("DHS") charged Silais with inadmissibility under 8 U.S.C. § 1182(a)(7)(A)(i). In response, Silais conceded his inadmissibility, based on his lack of valid documents, but requested asylum, withholding of removal, and protection under CAT.

### A. Removal Hearing

On April 30, 2013, an Immigration Judge ("IJ") conducted Silais's removal hearing. Silais testified and submitted documentary evidence. The IJ then continued the removal hearing to May 15, when Silais's country-conditions expert, Brian Concannon, was available to testify. Concannon is a human-rights attorney and the director of the Institute for Justice and Democracy in Haiti, a non-profit organization based in Boston.

#### 1. *Silais's Testimony*

Silais testified to the following alleged facts: He was born in Aux Cayes, Haiti. In 2003, he joined a Haitian political party known as the *Òganizasyon Pèp Kap Lité* (the "OPL"). At that time, the OPL was one of the two largest opposition political parties in Haiti. A group known as the *Chimères*, who supported then-President Jean-Bertrand Aristide, often disturbed OPL meetings that Silais had organized, beating participants, firing guns, or throwing rocks. Although the *Chimères* was not a government entity, it allegedly received benefits from various officials and included police officers in their ranks. Silais

identified two particular *Chimères* members he claimed he repeatedly encountered between 2002 and 2010: Ronald Felix and Charles Bertrand.

During a soccer game in 2002 where Silais was distributing political information, for example, both Felix and Bertrand allegedly threw rocks at the spectators and asked Silais about the papers he was distributing. They did not injure Silais at this incident.

At a later event, however, Felix purportedly attacked Silais in his neighborhood, pushing Silais down, placing a revolver in his mouth, and threatening to kill him. When other people approached them, Felix released Silais, who ran away. Felix allegedly threw rocks at Silais as he escaped.

Silais further testified that on February 22, 2004, Felix and Bertrand went to a political meeting Silais was attending and began asking him about his political affiliation. Silais informed them that he only wanted to educate people, and the *Chimères* did not harm him. During a Mardi Gras celebration soon afterward, though, both Felix and Bertrand allegedly attacked Silais in his neighborhood. Consequently, he fled and hid at his friend James Lete's house. Silais then testified that when the *Chimères* found Silais, they hit him with their hands and a pistol and struck his leg with a machete. After Silais began to bleed, Felix and Bertrand stopped, and Silais escaped to another friend's house. The *Chimères* then went to Silais's family's house and allegedly beat certain family members.[1]

---

[1] In his initial written statement, Silais had stated that he was at a "political meeting" when Felix and Bertrand attacked him, forcing him to run to Lete's home. His second written statement, however, reflected that he had encountered the *Chimères* "in the street." During the hearing, Silais

Silais then stated that, in September 2004, the *Chimères* attacked him while he was speaking at a political meeting and forced him to run away.

According to Silais, he left Haiti in November 2004 for the Dominican Republic, where he remained until January 2006,[2] when he heard that Haiti's condition had improved. Silais testified that he wanted to complete his studies in Haiti on "veterinary and agricultural techniques" that required two years of classroom work and one year of practice. He graduated from the program in January 2007.

Afterward, he worked with an organization that he had cofounded to assist Haiti's orphaned children.[3] Silais's organization hosted an event for World AIDS Day on December 1, 2009, and Felix, Bertrand, and other *Chimères* attended. They allegedly questioned Silais about what he was doing there, beat him, and forced him to leave the event.

Silais finally testified that during Haiti's 2010 presidential election, Silais was a representative for the *Repons Peyizan* political party, supporting then-candidate Michel Martelly. While working as a "poll watcher," Silais witnessed Felix and Bertrand attempt to commit voter fraud by stuffing ballots for Jude Celestin, their preferred candidate. When Silais tried to

---

expressed that his first statement was incorrect. In yet another account, Lete noted that Silais was at his "family's home" before fleeing from the *Chimères* to Lete's home. Silais also could not recall during the hearing whether he had hidden at Lete's house for hours or days.

[2] Silais's written statement asserts that he had returned to Haiti in *November* 2006.

[3] Silais could not remember the last name of one of the other three cofounders.

stop them, Felix purportedly hit and kicked him. As Silais tried to flee, Felix and Bertrand threw rocks at him. The police arrived and detained Felix, but released him after Silais departed without filing a report. Silais testified that he currently experiences lingering pain from this incident.

Silais never contacted the Haitian police to report any of the above alleged encounters with the *Chimères*. After the election, Silais left Haiti by boat to Guatemala.[4] Eventually, in 2011, Silais sought refuge in the United States.

### 2. *Documentary Evidence*

In addition to his testimony, Silais presented written statements and over twenty pieces of documentary evidence, including, in part, (1) documents concerning his identity, political party membership, employment, and education; (2) James Lete's declaration; (3) Dr. Nora Rowley's affidavit opining that Silais's scars were consistent with his alleged abuse; (4) Brian Concannon's affidavit; (5) a letter of support from Lawrence Hock, a church acquaintance; and (6) media reports and articles concerning Haiti's condition.

Silais also unsuccessfully attempted to enter other documentary evidence. During the break between April 30 and May 15, the government had submitted an unsolicited, written closing argument, highlighting that Silais's testimony was vague, inconsistent, and uncorroborated. On May 13, two days before the hearing was scheduled to continue, Silais submitted a response to the government's closing and moved to

---

[4] In his written statements, Silais claimed that there were about ten other individuals on the boat; however, during the hearing, he claimed that he had never reported that number because he had not counted the boat's passengers.

submit additional evidence "since DHS ha[d] called Mr. Silais' credibility into question." The additional evidence included: (1) Silais's own amended affidavit; (2) a declaration from Silais's brother-in-law addressing the chain of custody of the evidence he had collected in Haiti; (3) an affidavit from Silais's former attorney and interpreter discussing interpretation issues that arose in drafting Silais's original statement; and (4) a media account of a recent armed robbery of an OPL member in Haiti. The IJ denied Silais's motion to submit the additional evidence, because DHS had only recently received the materials and Silais had failed to make the subjects of the evidence available for cross-examination.

### 3.  Brian Concannon's Testimony

On May 15, Silais presented his country-conditions expert, Brian Concannon. Concannon stated that Haiti had experienced escalating conflict between 2000 and 2004. Some groups, including a few associated with the government, had engaged in suppression of anti-government political activity through intimidation, rock throwing, and gun violence. Meanwhile, the Haitian police had struggled with issues of discipline, corruption, and inexperience, rendering the Haitian justice system ineffective in prosecuting political killings. Over time, however, the relationship between Concannon's organization and Haitian justice officials improved, and the violence declined from previous levels. Later, however, during Haiti's 2010 presidential elections, the country suffered from incidents of voter fraud, including ballot stuffing. Moving forward, Concannon noted, Haiti remained vulnerable to political violence, particularly during presidential elections.

### B. The Immigration Judge's Decision

On January 21, 2014, the IJ denied Silais's petition for two alternative reasons: (1) he had not met his burden of proof, because (a) his testimony was vague and inconsistent, and (b) he had failed to present sufficient corroboration; and (2) he had not established eligibility for relief on the merits.

First, the IJ highlighted Silais's "vague and inconsistent testimony and the lack of evidence to corroborate events central to his claim." The judge then discussed a number of gaps in Silais's memory and inconsistencies among Silais's testimony, his written statements, and Lete's declaration. The IJ found Silais credible despite these inconsistencies, but found the substantial lack of corroboration fatal to his claim. For example, the IJ observed that Silais "did not submit affidavits or statements from key parties in his case, such as his brother-in-law, who currently lives in the United States and who went to Haiti to retrieve documents for [Silais]." Silais had also failed to present any evidence from any family members or co-workers to corroborate his specific claims of *Chimères* violence, and had not provided any medical reports related to his alleged injuries, despite reportedly seeking treatment. Further, he had not made any reasonable efforts to obtain this additional corroborative evidence, or explained why it would have been unreasonable to do so. Relatedly, Concannon's testimony, Silais's media articles, and Dr. Rowley's affidavit all failed to corroborate Silais's specific claims. In sum, the IJ concluded, Silais did "not me[e]t his burden of proof to establish eligibility for asylum, withholding of removal, or relief under CAT."

Alternatively, the IJ concluded that Silais was not eligible for relief on the merits. The harms Silais alleged constituted

harassment but did not rise to the level of past persecution. Further, though the *Chimères* had harassed Silais, he could not show that the Haitian government was unwilling or unable to protect him if he were to return—Silais had never attempted to file a police report or otherwise prompt law enforcement officers to intervene.

### C. The Board of Immigration Appeals's Decision

The Board of Immigration Appeals ("BIA") incorporated and affirmed the IJ's decision in a September 29, 2015 opinion. In its supplemental comments, the BIA pointed out inconsistencies throughout Silais's statements, criticized Concannon's and Dr. Rowley's evidence as too general, and noted the lack of testimony from Silais's brother-in-law. The BIA then rejected Silais's argument that the IJ's exclusion of the supplemental evidence prevented him from presenting his case. The BIA noted that the parties completed Silais's direct, cross, and redirect, and the IJ then continued the hearing only to make time for Concannon's testimony. The BIA further explained that the supplemental evidence "did not independently satisfy his burden of proof and did not address the weaknesses that the Immigration Judge identified in [Silais's] claim; namely, the lack of testimony and evidence from witnesses who could corroborate the events upon which [Silais's] claim was based." Specifically, the BIA repeatedly expressed its shared concern with the IJ: Silais had "not provide[d], or adequately explain[ed] the absence of, reasonably available corroborating evidence regarding critical elements of his claim, such as affidavits or other evidence from coworkers or family members in Haiti." Thus, concluded the BIA, Silais could not show that the IJ's actions prejudiced him.

## II. Discussion

"Where the Board affirms the immigration judge's decision and adds its own analysis, as it did here, we review the immigration judge's decision and the Board's additional reasoning." *Santashbekov v. Lynch*, 834 F.3d 836, 839 (7th Cir. 2016). The Agency is not required to "write an exegesis on every contention." *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000) (citation omitted). All it must do is "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id*.

We review the decisions to deny Silais's requested relief "under the highly deferential version of the substantial evidence test." *Mansour*, 230 F.3d at 905 (citation and internal quotation marks omitted). Under this standard of review, we must affirm the Agency's decisions if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole, and reverse when the evidence is so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Id*. at 905 (citation and internal quotation marks omitted); *see also Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007) (citation omitted). "To win a reversal under this deferential standard, [the petitioner] must show not merely that the record evidence supports a conclusion contrary to that reached by the BIA but that the evidence compels that contrary conclusion." *Kholyavskiy v. Mukasey*, 540 F.3d 555, 569 (7th Cir. 2008) (quoting *Bradvica v. INS*, 128 F.3d 1009, 1011 (7th Cir. 1997)).

On appeal, Silais challenges the Agency's denial of his petition for asylum and withholding of removal.[5] To qualify for asylum, Silais must show "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" upon return to Haiti. 8 U.S.C. § 1101(a)(42); *see also* 8 C.F.R. § 208.13(b)(1). Silais's eligibility for withholding of removal hinges on whether his "life or freedom would be threatened" in Haiti due to his political opinion, among other things. 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b). "A finding of past persecution creates a rebuttable presumption of future persecution." *Stanojkova v. Holder*, 645 F.3d 943, 946 (7th Cir. 2011) (citing 8 C.F.R. §§ 208.16(b)(l)(i), 1208.16(b)(l)(i)). Bad acts by private individuals may constitute persecution only if the foreign government was complicit in those acts or was unable or unwilling to take steps to prevent them. *N.L.A. v. Holder*, 744 F.3d 425, 440 (7th Cir. 2014) (citing *Cece v. Holder*, 733 F.3d 662, 675 (7th Cir. 2013)).

Silais argues that the Agency (1) ignored or misconstrued various arguments and evidence; (2) violated his statutory and due-process right to present evidence; and (3) incorrectly concluded that the alleged violence did not amount to past persecution. We address each contention in turn.

---

[5] Silais did not contest, and thus waived any right to challenge, the Agency's conclusion that he was ineligible for relief under CAT. *See Tandia v. Gonzales*, 487 F.3d 1048, 1050 (7th Cir. 2007) ("Although [petitioner's] opening brief in this court mentions his claims for withholding of removal and CAT relief, he does not set forth any arguments in support of these claims, so they are waived.") (citation omitted).

### A.  Agency Handling of Arguments and Evidence

Silais makes various arguments that the Agency abused its discretion by ignoring or misconstruing certain arguments and pieces of evidence. We have explained that "completely ignoring an argument" constitutes legal error, *Iglesias v. Mukasey*, 540 F.3d 528, 530–31 (7th Cir. 2008), as does ignoring evidence or failing to address necessary elements of a legal analysis, *Jawad v. Holder*, 686 F.3d 400, 404 (7th Cir. 2012). If, however, the record reveals that the Agency did not ignore an argument or evidence (*e.g.*, if "the IJ described [the] testimony [at issue] in detail and evaluated its relevance," *id.*), there is no error. *Id*. In those instances, the IJ's findings of fact are conclusive unless a "reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Santashbekov*, 834 F.3d at 839.

First, Silais contends that both the IJ and BIA ignored Concannon's testimony and Dr. Rowley's affidavit. He relatedly asserts that the BIA misconstrued his argument that the IJ had ignored this evidence—incorrectly understanding his argument to be that the IJ had erred by ascribing the evidence little weight. Neither the IJ nor the BIA, however, ignored Concannon's testimony or Dr. Rowley's affidavit. The IJ spent nearly two pages describing Concannon's testimony in detail. In the end, however, the IJ concluded that "[w]hile there is no reason to doubt the credibility of Concannon's testimony and affidavit, he does not know the respondent personally and could not attest to any specific facts of his claim." Likewise, the IJ "considered … [the] Affidavit and Curriculum Vitae of Dr. Nora Rowley" and referenced "a statement from Dr. Nora Rowley about [Silais's] claimed trauma and its likely causes."

Again, however, the IJ took issue with the evidence, highlighting that "Dr. Rowley did not testify, she was not available for cross-examination on her assertions, and she was not qualified as an expert by the court." The BIA made the same findings. Apart from incorporating the IJ's findings of fact, the BIA also added the following regarding Concannon: "While [Silais's] evidence of country conditions, including [Concannon's] testimony, do provide some support for the plausibility of his claim, such evidence is general in nature and does not address the specific incidents he allegedly endured." (citation omitted). Continuing to Dr. Rowley's affidavit, the BIA concluded, "[T]he medical evidence [Silais] submitted was created years after the alleged incidents, not at the time of the events in question, and the doctor was not made available for cross-examination." So the Agency evaluated the evidence at issue and simply found that it was insufficient to corroborate Silais's specific claims of harm. As such, Silais's argument that the Agency ignored or misconstrued Concannon's and Dr. Rowley's evidence amounts to nothing more than frustration with the IJ's factual findings. Without more, we see no reason to disturb them.

*Mansour* does not change this outcome. There, we held that the BIA's reference to the petitioner and his family as "Syrian Christians"—when they were actually "Assyrian Christians"—was a potentially critical mistake: According to the evidence, Assyrians were non-Arab Christians, while Syrians were largely Muslim. 230 F.3d at 908. This mistake carried with it the potential for serious repercussions for the petitioner's religion-based torture claim, and forced us to question whether the BIA had adequately addressed that claim; so we remanded. *Id.* at 909. Silais argues that the Agency's misinterpretation of his arguments and evidence is analogous to

the mistake in *Mansour*. We cannot, he concludes, be sure the BIA understood his claim. In *Mansour*, however, the BIA's mistake was so fundamental to the petitioner's torture claim that the Board had effectively ignored it, which is a legal error. Here, the BIA made no such mistake. Far from misunderstanding Silais's claim or evidence, both the BIA and the IJ dealt extensively with Concannon's testimony and Dr. Rowley's affidavit and simply found them insufficient.

Second, Silais maintains that the BIA failed to address his argument that the IJ had incorrectly summarized Concannon's testimony. The IJ concluded that "the [Haitian justice] system ha[d] gradually been getting better" since 2006. Silais argues, however, that Concannon had testified that *his team's relationship* with Haitian justice officials was getting better. Again, this is simply a factual disagreement. After detailing Concannon's testimony, the IJ understood the Haitian justice system to be gradually improving. And there was evidence to support this conclusion: Concannon testified in part that armed groups in Haiti had recently been less organized and less directly tied to political leaders, and, at the time, the level of violence in Haiti was lower than it was in 2004. Nothing in the record compels us to disagree.

Finally, Silais argues that the Agency abused its discretion by misrepresenting the 2010 election incident. He claims that the Agency erroneously considered only that the Haitian police had detained the *Chimères* who had attacked Silais and that he had fled the scene without filing a police report. In doing so, Silais concludes, the Agency ignored the fact that the police had released the *Chimères* soon afterward—a mistake, he argues, that we found determinative in *Chitay-Pirir v. INS*, 169 F.3d 1079, 1081 (7th Cir. 1999). There, however, we

observed that the BIA's assertion that four assailants were arrested and two of them were convicted of murder "ha[d] *no support in the record*," which showed that the police had only detained and quickly released the four assailants, and then detained two of them a second time. *Id*. at 1081 (emphasis added). Here, the Agency's assertions were supported by the record. And, although the Agency did not mention that the police had released Felix, the Agency relied on this incident as another example of how Silais had failed to avail himself of police protection. The fact that the police eventually released the assailant after no incident report or charges were filed does not detract from that conclusion.

## B. Right to Present Evidence

Silais also argues that the Agency violated his right to present evidence. "A petitioner's claim that the immigration hearing was procedurally insufficient is reviewed *de novo*." *Pronsivakulchai v. Gonzales*, 461 F.3d 903, 907 (7th Cir. 2006) (citation omitted).

According to Silais, the Agency violated both his statutory and constitutional due-process right to present evidence by denying his request to submit supplemental materials during the removal hearing. We have stated that "[n]on-constitutional arguments always come first; constitutional contentions must be set aside until their resolution is unavoidable." *Boyanivskyy v. Gonzales*, 450 F.3d 286, 292 (7th Cir. 2006) (citations omitted, alteration in original).

Silais's right to a reasonable opportunity to present all relevant evidence at an impartial hearing is protected by statute and regulation. *Id*. at 292–93 (citing 8 U.S.C. § 1229a(b)(4)(B) ("the alien shall have a reasonable opportunity … to present

evidence on the alien's own behalf, and to cross-examine wit-
nesses presented by the Government"); 8 C.F.R. § 1240.1(c)
("The immigration judge shall receive and consider material
and relevant evidence, rule upon objections, and otherwise
regulate the course of the hearing.")). Thus, we evaluate the
IJ's action for compliance with these provisions rather than
with constitutional due process. *Id.*[6] "[T]he appropriate char-
acterization of the IJ's action is, in essence, a matter of degree.
In the end, we must determine whether, given the totality of
circumstances, the petitioner had a full and fair opportunity
to put on [his] case." *Rodriguez Galicia v. Gonzales*, 422 F.3d 529,
538 (7th Cir. 2005); *see also* 8 U.S.C. § 1229a(b)(4)(B).

Courts, however, "do not set aside agencies' decisions un-
less mistakes cause prejudice." *Rehman v. Gonzales*, 441 F.3d
506, 509 (7th Cir. 2006) (citation omitted). To prevail, Silais
must show "prejudice such that the IJ's mistake impacted the
outcome of the proceedings." *Pronsivakulchai*, 461 F.3d at 907
(citation omitted). In other words, Silais must "produce some
concrete evidence indicating that the violation of a procedural
protection actually had the potential for affecting the outcome
of … deportation proceedings." *Shahandeh-Pey v. INS*, 831 F.2d
1384, 1389 (7th Cir. 1987) (emphasis removed); *see also Roman
v. INS*, 233 F.3d 1027, 1033 (7th Cir. 2000). He stresses that the

---

[6] We would reach the constitutional inquiry only if Silais had com-
plained that the procedures outlined in the statutes and regulations were
constitutionally deficient. *Boyanivskyy*, 450 F.3d at 292 (citation omitted);
*see also Pronsivakulchai*, 461 F.3d at 907 (cautioning against "leading with
an open-ended due process argument" and advising petitioners to "stick
with claims based on the statutes and regulations unless they believe that
one of these rules violated the Constitution or that lacunae in the rules
have been filled with defective procedures") (citation omitted). Silais
makes no such claim.

Agency denied Silais's "asylum claim because he did not pro-
vide the very evidence the IJ rejected." It is true that the
Agency denied his claim in part due to inconsistencies across
his written and oral testimony and a lack of corroborating ev-
idence from his brother-in-law, who retrieved certain docu-
mentary evidence from Haiti. And some of the rejected evi-
dence arguably would have addressed these issues. Yet, *none*
of the supplemental proffer addressed the Agency's repeated
concern: the lack of evidence specifically corroborating the in-
cidents of violence about which Silais testified. Silais pro-
vided no medical-treatment records related to his own al-
leged injuries and no testimony from family or co-workers
who were also allegedly beaten and threatened. Likewise, he
failed to demonstrate to the Agency that obtaining such evi-
dence would have required unreasonable efforts. These omis-
sions alone were sufficient to preclude Silais from receiving
relief. As none of the additional evidence would have filled
this gap, Silais cannot show that the outcome would have
been different had the IJ admitted his supplemental evidence.

Silais maintains that the Agency erred by neither warning
him that specific corroborating evidence was necessary nor
giving him an opportunity to supplement the record. In
*Darinchuluun v. Lynch*, however, we stated that no such prior
notice or later opportunity is required, because the REAL ID
Act itself informs petitioners that the IJ may require corrobo-
rating evidence—even if, as here, they are found to be credi-
ble. 804 F.3d 1208, 1216 n.21, 1216–17 (7th Cir. 2015) (citing 8
U.S.C. § 1158(b)(1)(B)(ii); *Rapheal v. Mukasey*, 533 F.3d 521, 530
(7th Cir. 2008)); *see also Abraham v. Holder*, 647 F.3d 626, 633
(7th Cir. 2011). Silais asserts that *Darinchuluun* was incorrectly
decided and must be overturned; but he waives this argument
by failing to support it in any way. *See Puffer v. Allstate Ins. Co.*,

675 F.3d 709, 718 (7th Cir. 2012) (recognizing the well-estab-lished principle that arguments that are "underdeveloped, conclusory, or unsupported by law" are waived).

Next, relying on *Boyanivskyy*, 450 F.3d at 291, Silais argues that the IJ's rejection of the supplemental evidence prejudiced him by essentially manufacturing an underdeveloped record. In that case, however, the IJ knowingly scheduled the hearing for a day it knew the petitioner's three crucial witnesses could not testify, and seemingly forced the petitioner to prematurely rest his case. *Id*. The IJ then highlighted the lack of corrobora-tion as a principal reason for denying the petitioner's claim. *Id*. We determined that the IJ's actions had prejudiced the pe-titioner, as the witnesses were crucial to his claim and likely would have altered the outcome. *Id*. at 294. Here, the IJ al-lowed Silais to testify fully, to submit over twenty pieces of documentary evidence, and to present a country-conditions expert. And even if the IJ had admitted the extra materials at issue, Silais's case still would have lacked corroborating evi-dence of the specific incidents of harm and violence to him and his family. Further, this is not evidence that Silais had un-successfully tried to submit, as occurred in *Boyanivskyy*; ra-ther, Silais did not present or reasonably try to obtain it. Given this omission in the record, Silais cannot demonstrate preju-dice.

Silais finally posits that the Agency should have consid-ered and admitted the supplemental evidence given that we have required them to do so in the motion-to-reopen context. *See, e.g., Boika v. Holder*, 727 F.3d 735, 738–40 (7th Cir. 2013). This comparison is inapt. The Agency cannot adequately con-sider whether there is good cause to reopen a case without reviewing evidence relevant to the question. This logic does

not map neatly onto submissions of evidence *during* a hearing, where the IJ receives evidence, rules on admissibility, enforces deadlines and adheres to considerations of procedural efficiency. *See* 8 C.F.R. § 1240.1(c) ("The immigration judge shall … regulate the course of the hearing."); 8 C.F.R. § 1003.31(c) ("If an application or document is not filed within the time set by the Immigration Judge, the opportunity to file that application or document shall be deemed waived.").

### C. Past Persecution

Lastly, Silais challenges the Agency's conclusion that the alleged harm he had experienced did not amount to past persecution. The evidence of his and his family's harm, while disturbing, was uncorroborated and does not compel us to conclude differently. In addition, Silais failed to successfully demonstrate that the Haitian government was unable or unwilling to protect him—a required showing given that Silais's claim was based on the violent acts of the *Chimères*. *See N.L.A.*, 744 F.3d at 440 (citing *Cece*, 733 F.3d at 675). As the Agency stressed, Silais did not report any of the alleged incidents of harm to the Haitian police to give them an opportunity to intervene. While he challenged the Agency's conclusion tangentially by arguing that the Agency had ignored related evidence, we have rejected those arguments.[7] This leaves the Agency's finding otherwise undisturbed.

In any event, the primary case upon which Silais relies, *Gomes v. Gonzales*, 473 F.3d 746 (7th Cir. 2007), reflects harms on a wholly different level than what he was forced to endure.

---

[7] Silais did not explicitly contest the fact that he had never filed a police report, but his assertions that the Agency ignored or improperly rejected related arguments and evidence suffice to raise the issue on appeal.

There, the petitioner was brutally attacked while riding his motorcycle: He was knocked unconscious, broke his jaw, required twenty stitches in his head, had his lips stitched together, spent over a week in the hospital, and suffered from memory loss. *Id*. at 750. After he returned home from the hospital, his attackers broke down his door, ransacked his house, set fire to his curtains, pushed him and his wife to the ground, and placed large knives at their throat, threatening to kill them. *Id*. at 750–51, 754. His family was also attacked on multiple occasions (*e.g.*, having their head, arms, and tongues sliced with knives; getting robbed; having guns pointed at their heads), and one of his relatives was murdered. *Id*. at 751. Moreover, unlike Silais, the petitioner in *Gomes* was able to corroborate these attacks with medical records, dental records, letters from witnesses, and newspaper articles of the specific incidents. *Id*. at 750–51.

In sum, while we do not intend to downplay what Silais allegedly experienced in Haiti, we hold that the record does not compel us to reject the Agency's decision.

### III. Conclusion

For the foregoing reasons, the petition for review of the Board's decision is DENIED.